## 17719

Jesse T. REESE, Jr., Appellant, v. C. Laney TALBERT, County Supervisor; and Robert W. Eleazer, William C. Mahaffey, Jr., R. M. McGregor, J. L. Moore, T. D. Palmer, J. S. Sites and K. B. Taylor, together constituting the County Board of Commissioners of Richland County, Respondents

(117 S. E. (2d) 375)

*John G. Martin, Esq.,* of Columbia, *for Appellant,*

*Messrs. Frank A. Graham, Jr.,* of Columbia, and *Huger Sinkler,* of Charleston, *for Respondents,*

December 6, 1960.

LEGGE, Justice.

The Act of April 1, 1960 (51 Stat. at Large, p. 2799) purports to authorize the issuance of general obligation bonds of Richland County in an amount not exceeding $350,000.00, the proceeds thereof to be used for the improvement and renovation of existing public hospital facilities in that county. Plaintiff seeks in this action a judgment declaring that Act unconstitutional because it makes no provision for an election, which he contends is required by a special amendment of the Constitution, ratified February 25, 1921, relating to the bonded indebtedness of Richland County. That amendment reads:

"That the limitations imposed in Section 7, of Article VIII, and in Sections 5 and 6 of Article X of the Constitution of the State of South Carolina, shall not apply to the bonded indebtedness incurred by the County of Richland,

when the proceeds of any bonds issued by said County are applied exclusively to the purpose of erection, improvement and maintenance of a public hospital and court house or in payment of debts incurred, and when the question of incurring such indebtedness is submitted to the qualified electors of said county, as provided by law."

The circuit decree, pointing out that at the time of the amendment in question the fifteen per cent over all debt limitation prescribed by Article X, Section 5, was being strictly observed under the literal interpretation that had been given it by this court in *Todd v. City of Laurens,* 1897, 48 S. C. 395, 26 S. E. 682, concludes that the legislative purpose of the amendment was merely to enable Richland County to issue bonds for courthouse or hospital purposes if and when that limitation would be thereby exceeded, provided the question of their issuance were voted upon in the affirmative by the qualified electors of the county.

When the language of a constitutional amendment is of doubtful import, the object of judicial inquiry as to its meaning is to ascertain the intent of its framers and of the people who adopted it. *Heinitsh v. Floyd,* 130 S. C. 434, 126 S. E. 336; *Duncan v. Record Publishing Co.,* 145 S. C. 196, 143 S. E. 31; *Ansel v. Means,* 171 S. C. 432, 172 S. E. 434. And in attempting to attain that object, the courts may consider the history of the times in which the amendment was framed, the object sought to be accomplished, and legislative interpretation of its provisions. *Kirkland v. Allendale County,* 128 S. C. 541, 123 S. E. 648; *Covington v. McInnis,* 144 S. C. 391, 142 S. E. 650; *Powers v. State Educational Finance Commission,* 222 S. C. 433, 73 S. E. (2d) 456; *Johnson v. Thomason,* 236 S. C. 135, 113 S. E. (2d) 417.

The reason assigned by the circuit court for its conclusion before stated would be more persuasive if when the amendment in question was proposed the amount of Richland County's bonded debt had been such that the issuance of

bonds for hospital and courthouse purposes would likely have resulted in an excess of bonded indebtedness over the eight per cent limitation or the fifteen per cent over-all limitation prescribed by Article X, Section 5. But the record here discloses no factual basis for the assumption that such would have been the case. It is true that the defendants in their answer alleged, upon information and belief, "that on the occasion that the Constitutional amendment was adopted, the debt of Richland County, and certain of the political subdivisions and municipal corporations covering and extending over portions of the territory of Richland County, was such that the original limitations of Section 5 of Article X would be violated by further incurring of bonded debt, and for this reason it was necessary to provide means for the issuance of bonds." But no proof in support of that allegation appears in the record. Actually, the circuit decree made no direct factual finding as to the quoted allegation; it went no farther than to say that the City of Columbia, "at that time had a substantial debt", and that "school districts and townships likewise had bonded debt"; and the record discloses no evidentiary basis for even that finding.

The amendment under consideration provides that the limitations imposed in Section 7 of Article VIII and in Sections 5 and 6 of Article X shall not apply to bonded indebtedness incurred by Richland County when the proceeds of bonds issued by it are applied exclusively to the purpose of erection, improvement and maintenance of a public hospital and courthouse "* * * and when the question of incurring *such indebtedness* is submitted to the qualified electors of said municipality, as provided by law." (Italics ours.) The italicized words plainly indicate that an election is required as a condition precedent to the issuance of bonds for such purposes, and the amendment contains on its face no provision limiting that requirement to a situation in which by the issuance of such bonds the county's bonded debt will exceed the amount limited by the Constitution. Respondents, so conceding, argue: that the amendment con-

tains no language expressly or by reasonable implication curtailing the legislative power, existing prior to its adoption, to authorize the county to issue, without an election, bonds up to the constitutional debt limit; that all amendments to Sections 5 and 6 of Article X have been for the purpose of enlarging, not reducing, the original debt limits, *Knight v. Allen,* 234 S. C. 559, 109 S. E. (2d) 585; and that therefore the circuit decree correctly held that since the bonds authorized by the Act of April 1, 1960 will be within the constitutional debt limit of Richland County, no election was necessary. The following considerations suggest a contrary conclusion:

1. As we have already indicated, to sustain respondents' position would require writing into the amendment a provision not suggested by its language or by any pertinent circumstances shown by the record to have surrounded its proposal and adoption.

2. Section 5 of Article X contains three distinct limitations upon the power of the General Assembly to permit a county to issue general obligation bonds, *viz.*:

(a) That its bonded indebtedness shall not exceed eight percent of the assessed value of all taxable property within the county;

(b) That the aggregate debt upon any territory overlapped by several political divisions or municipal corporations shall not exceed fifteen percent of the assessed value of all taxable property within such territory; and

(c) That a county may be vested with power to assess and collect taxes (a power essential to the issuance of general obligation bonds) only for "corporate purposes."

Further limitation is found in the provision of Section 6 of Article X that "the General Assembly shall not have power to authorize any county * * * to levy a tax or issue bonds for any purpose except for educational purposes, to build and repair public roads, buildings and bridges, to maintain and support prisoners, pay jurors, County officers,

and for litigation, quarantine and court expenses and for ordinary County purposes, to support paupers, and pay past indebtedness."

The legislative thinking in regard to the amendment in question may well have been influenced by the last mentioned limitation of Section 5 and the quoted limitation of Section 6, of Article X, because of doubt at the time of its proposal, 1920, and its ratification, 1921, that the erection, improvement and maintenance of a public hospital were "corporate purposes" or "ordinary County purposes" within the meaning of those limitations. That such doubt existed as late as 1924 is evident from *Battle v. Willcox*, 128 S. C. 500, 122 S. E. 516, decided in that year. Why the amendment referred also to the erection, improvement and maintenance of a courthouse must be left to conjecture. The establishment of a courthouse would appear to be a proper county purpose under Sections 5 and 6 of Article X as originally written; and since Richland County had had its courthouse for many years prior to 1920, it can only be surmised that the erection of a new one was at that time considered an item of expense so extraordinary as to require its approval by the voters of the county.

(Since Section 7 of Article VIII relates solely to bonded indebtedness of cities and towns, we confess our inability to understand why the Amendment with which we are here concerned made reference to it.)

3. Section 6 of Article X, which in detail limits the purposes for which the General Assembly may authorize a county or township to issue general obligation bonds, appears to have been amended but five times, as follows:

(a) 1911. To authorize townships in Greenwood and Saluda Counties through which a proposed railroad was to be constructed to vote bonds in aid of the construction of said railroad.

(b) 1921. The amendment here involved, authorizing Richland County to issue bonds for the erection, improvement and maintenance of a public hospital and courthouse.

(c) 1923. To authorize Christ Church Parish Township in Charleston County to vote bonds for the construction and maintenance of a railroad through that township and through the town of Mount Pleasant.

(d) 1927. To authorize St. James Santee Township in Charleston County to vote bonds for the construction and maintenance of a railroad through that township.

(e) 1945. To authorize counties and townships to issue bonds for the construction and maintenance of airports or landing strips.

Since all of the other amendments of Section 6 dealt with the issuance of bonds for purposes other than those limited by the section as originally adopted, it would seem reasonable to infer that those contemplated by the Richland amendment, at least so far as they related to bonds for the construction, improvement and maintenance of hospitals, were also considered as beyond the scope of the original section, and that that amendment was concerned with enlargement of the purposes for which Richland County might be authorized to issue bonds, as well as with the amount of the contemplated issue.

4. On February 25, 1921, the same day on which the amendment in question was ratified, the General Assembly passed an Act (32 Stat. at Large, p. 25) authorizing Richland County to issue bonds not to exceed $300,000.00 for the purpose of taking over, operating and maintaining the Columbia Hospital, $100,000.00 of the proceeds of said bonds to be used for acquisition, and the balance for improvement and maintenance. The act required, as a condition precedent to the issuance of said bonds, that the question of their issunace be voted upon by the qualified electors of the county at an election to be held for that purpose.

(On February 28, 1921, an Act was passed, 32 Stat. at Large, p. 728, authorizing the issuance of $500,000.00 of bonds of Richland County, the proceeds to be used to build a new courthouse. This act likewise required an election on the question of the issuance of said bonds.)

On June 3, 1940, an Act was passed, 41 Stat. at Large, p. 2726, authorizing the issuance of $425,000.00 of bonds of Richland County, the proceeds to be used to improve, enlarge, extend and equip the Richland County Hospital. Again an election was required.

By the Act of May 11, 1955, 49 Stat. at Large, p. 1313, Richland County was authorized to issue up to $1,405,000-.00 of bonds for capital improvements to its existing hospital facilities. Again an election was required.

By the Act of May 9, 1957, 50 Stat. at Large, p. 1293, Richland County was authorized to issue not exceeding $1,-600,000.00 of bonds for capital improvements to its existing hospital facilities. Again an election was required. As in the 1955 Act, the purpose of the issue, as required to be stated on the ballot, was "payment of the cost of constructing and equipping hospital facilities in Richland County."

It is, of course, possible that in proposing and ratifying the 1921 Amendment the General Assembly may have intended, as respondents argue, that the question of issuing bonds for hospital purposes should be submitted to the voters of Richland County only when the issuance of such bonds would raise that county's bonded debt beyond the amount limited by the Constitution. But no such legislative intent is suggested by the language of the Amendment or by that of the legislation just mentioned; and, as before pointed out, there is in the record before us no factual showing of such intent. We are not at liberty to assume it; to do so would lead us, under the guise of interpretation, to amend the Amendment by adding a proviso so as to make it conform to respondents' view.

In our opinion the 1921 Amendment requires the vote of the qualified electors of Richland County on the question of the issuance of bonds such as are proposed to be issued under the Act of April 1, 1960, and that Act is invalid in that it makes no provision for such election.

Reversed.

STUKES, C. J., and TAYLOR, OXNER and MOSS, JJ., concur.